IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| Certain Underwriters at Lloyd's, | * | |
| London Subscribing to Certificate | * | |
| Nos. 1149760, 1149761 and 1149763 | * | |
| | * | |
| v. | * | Civil No. JKS 13-311 |
| | * | |
| Max Harry Cohen, M.D., and Max | * | |
| Harry Cohen, M.D., Chtd. | * | |
| | * | |

## MEMORANDUM OPINION

Presently pending are Plaintiffs' Motion for Summary Judgment, ECF No. 31, Defendants' Cross Motion for Summary Judgment, ECF No. 35, Plaintiffs' Motion to Exclude Opinion Testimony of David Paige, ECF No. 37, and Defendants' Motion to Exclude Opinion Testimony of Thomas R. Petersen, ECF No. 36. The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. For the reasons set forth below, Plaintiffs' motion for summary judgment will be granted, Defendants' motion for summary judgment will be denied, Plaintiffs' motion to exclude will be denied as moot, and Defendants' motion to exclude will be denied as moot.

**I.  Background.**

The following facts are either undisputed or are taken in the light most favorable to Defendants. Plaintiffs are underwriters at Lloyd's of London subscribing to certificate numbers 1149760, 1149761 and 1149763. Defendants are Dr. Max H. Cohen, a general surgeon, and his company, Max Harry Cohen, M.D., Chtd., the corporate entity established to operate his practice. ECF No. 1 at 2. Plaintiffs allege that Dr. Cohen made material misrepresentations on applications for disability insurance and seek a declaration that their decision to rescind the policies was proper.

1

On April 1, 2011, Dr. Cohen submitted initial applications for disability insurance coverage to Petersen International Underwriters (PIU). ECF No. 35 at 3; Bernau Aff. ¶ 2, Ex. A at 48:21–49:3. PIU is a Lloyd's coverholder with authority to bind disability insurance coverage for various Lloyd's syndicates. Bernau Aff. ¶ 2, Ex. A at 9:17–10:4. In the applications, Dr. Cohen listed his employment address in Potomac, Md. He answered "Yes" to the question "Are you actively at work?" He stated that his "occupation" was "surgeon" and his "daily duties" were "surgery." Petersen Aff. ¶ 2, Ex. B at UWS 0133, 157, 182. He answered "No" when asked "Are you a party to any legal proceeding at this time?" *Id.* He responded "No" when asked "Are you aware of any facts that could change your occupation or financial stability?" and gratuitously added "opening D.C. Office." *Id.* Dr. Cohen signed final applications, with the same answers, on August 8, 2011, and the policies became effective immediately thereafter. Petersen Aff. ¶ 2, Ex. B at UWS 0136; Petersen Aff. ¶ 3, Ex. C at UWS 0160; Peterson Aff. ¶ 4, Ex. D at UWS 0185; Bernau Aff. ¶ 2, Ex. A at 48:6-49:3; Def.'s Answer to Pls.' Complaint ¶¶ 6, 17; Petersen Aff. ¶ 2-4, Exs. B-D; Bernau Aff. ¶ 2, Ex. A at 48:6-49:3.

On April 12, 2011, less than two weeks after submitting the initial applications, Dr. Cohen executed a Consent Order with the Maryland State Board of Physicians (the Board), Bernau Aff. ¶ 3, Ex. B at UWS 0089, the terms of which he had accepted on February 2, 2011. *Id*. at 0069-70. The Order memorialized the findings of the Board related to a grievance initiated on August 16, 2010, charging Dr. Cohen with multiple violations of the Maryland Medical Practice Act. *Id*. at UWS 0096. The Order found that, among other things, Dr. Cohen violated the standard of quality care, *see* MD. CODE ANN., HEALTH OCC. (H.O.) § 14-404(a)(22) (1981, 2009 Repl. Vol.), grossly over-utilized health care services, *see* H.O. § 14-404(a)(19), and failed to maintain adequate medical records, *see* H.O. § 14-404(a)(40). *Id.* at UWS 0085. The agreed

sanctions included a three month suspension of Dr. Cohen's license to practice medicine, beginning on August 2, 2011, six days before Dr. Cohen signed the final policy applications. *Id.* Moreover, during the three-month period prior to the suspension, Dr. Cohen agreed to wind down his practice and refer all patients to other practitioners. *Id.* Following the wind down and subsequent suspension, Dr. Cohen had to provide the Board with 60 days' notice of his intent to become clinically active; if he returned to practice, he would be on five years' probation, subject to various terms and conditions. *Id.* at UWS 0086-87. For the first year of active practice, Dr. Cohen would be supervised and required to obtain a second opinion from a "Board-approved supervisor" to confirm the medical necessity of, and technique used for, any surgical/diagnostic procedure that he prescribed for his patients. *Id.* at UWS 0086. Finally, Dr. Cohen agreed to pay a $5,000 fine. *Id.* at UWS 0087.

The District of Columbia Board of Medicine issued an order dated December 19, 2012, placing Dr. Cohen on probation for five years and imposing various other limitations, restrictions, and obligations regarding his practice of medicine in that jurisdiction. Petersen Aff. at ¶ 11; Bernau Aff. at ¶ 4, Ex. C at 1250-55. This D.C. order was based solely on the Maryland Consent Order. *Id.*

On September 8, 2011, one month after the disability policies became effective, Dr. Cohen sought medical treatment for numbness in his right thumb and pain in his right leg after falling. ECF No. 22, Cohen Answer to Amended Complaint at ¶ 18. On September 30, 2011, Dr. Cohen's agent provided Plaintiffs with notice of a potential claim resulting from the September 8, 2011 fall. Cohen Answer at ¶ 19. Plaintiffs retained Disability Management Services, Inc. (DMS) to investigate and adjust the potential claim, and on October 3, 2011, Dr. Cohen confirmed his intent to file the claim. *Id.*

During its investigation, DMS learned of the Consent Order and its contents, and, as a result, advised Dr. Cohen of Plaintiffs' intent to rescind the policies. Cohen Answer at ¶ 22; Bernau Aff. at ¶ 5, Ex. D at UWS 0507-11.  Enclosed with that letter was a check refunding Dr. Cohen's premium payments with interest.  Cohen Answer at ¶ 23; Bernau Aff. at ¶ 5, Ex. D at UWS 0512-22.  Dr. Cohen responded with numerous telephone calls and facsimiles to DMS, Cohen Answer at ¶ 24, and initiated the policies' grievance procedures. *Id.*  DMS conducted a review and affirmed the rescission decision.  *Id.*; Bernau Aff. at ¶ 6, Ex. E at UWS 0846-49. Upon Dr. Cohen's request for an informal review, Plaintiffs retained outside counsel to reexamine the matter and again upheld the rescission on August 7, 2012.  Cohen Answer at ¶ 24; Bernau Aff. at ¶ 7, Ex. F at UWS 0112.  Plaintiffs subsequently filed this action seeking a declaration that the policies were properly rescinded.

## II.     Standard of Review.

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *Emmett*, 532 F.3d at 297.  "A party who bears the burden of proof on a particular claim must factually support each element of his or her claim." *Billco Int'l, Inc. v. Charles Prods.*, 776 F. Supp. 2d 105, 110 (D. Md. 2011) (citation omitted).  "A complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Id.* "Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial." *Id.*  "A mere scintilla of proof, however, will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307,

314 (4th Cir. 2003). There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Billco*, 776 F. Supp. 2d at 110 (citation and quotation marks omitted).

## III. Discussion.

Plaintiffs assert that they were justified in rescinding the disability insurance policies because of material misrepresentations in Dr. Cohen's applications. A material misrepresentation in an application invalidates an insurance policy issued on the basis of that application. *Bryant v. Provident Life & Accident Ins. Co.*, 22 F. Supp. 2d 495, 497 (D. Md. 1998) (citation omitted). This principle is also recited in the Insurance Article of the Maryland Code:

> A misrepresentation, omission, concealment of facts, or incorrect statement does not prevent a recovery under the policy or contract unless:
>
> (1) the misrepresentation, omission, concealment, or statement is fraudulent or material to the acceptance of the risk or to the hazard that the insurer assumes; or
>
> (2) if the correct facts had been made known to the insurer, as required by the application for the policy or contract or otherwise, the insurer in good faith would not have:
>
>     (i)    issued, reinstated, or renewed the policy or contract;
>
>     (ii)   issued the policy or contract in as large an amount or at the same premium or rate; or
>
>     (iii)  provided coverage with respect to the hazard resulting in the loss.

MD. CODE ANN., INS. § 12-207(b) (1997, 2011 Repl. Vol.). "Maryland law imposes a 'heavy burden' on insurance applicants to correctly complete their applications." *Essex Ins. Co. v. Hoffman*, 168 F. Supp. 2d 547, 553 (D. Md. 2001) (citations omitted). "When an applicant makes a material misrepresentation on its application, the insurer may be

entitled to void the policy *ab initio*," *id*., and this is true "regardless of whether the material misrepresentation is made intentionally, or through mistake and in good faith." *Bryant*, 22 F. Supp. 2d at 407 (citations omitted). In order to determine whether the insurer validly rescinded the policy, the court must determine (1) whether a misrepresentation occurred and (2) whether the misrepresentation was material to the risk assumed by the insurer. *Id.* "The materiality of a misrepresentation can be determined as a matter of law 'when the evidence is clear and convincing, or uncontradicted.'" *North Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 728 (D. Md. 1997) (quoting *Peoples Life Ins. Co. v. Jerrell*, 271 Md. 536, 538 (1974)).

Here, Plaintiffs contend that Defendants misrepresented (1) that Dr. Cohen was "actively at work"; (2) that his occupation was "surgeon"; and (3) that Dr. Cohen was not "aware of facts that could change [his] occupation or financial stability."[1] The court agrees. Dr. Cohen said that his occupation was surgeon, claimed to be actively working, and denied being aware of any fact that could change his occupation or financial stability,[2] when, in fact, his license was suspended and he had agreed to wind down his practice and refer his patients to other physicians. His statements were thus patently false.

Dr. Cohen argues that "there was never any danger of him not being a surgeon as a result of the suspension," that "he never stopped being a surgeon," that "he was financially stable," and

---

[1] Defendants also contend that Dr. Cohen misrepresented that he was not a party to a legal proceeding. In light of the ambiguity surrounding that contention, the court will not base its opinion on that claim.

[2] Dr. Cohen also wrote "Opening D.C. office" next to this answer. *Id.* Defendants claim that Dr. Cohen's answer to this question must not have been important because Plaintiffs did not ask for further information regarding the opening of the D.C. office. ECF No. 35 at 9. Defendants provide no support for the proposition that an insurer must ask follow up questions in order to prove that it deems a statement important. An insurer has "a duty to investigate the information provided by insurance applicants only in extraordinary situations when the insurer is on notice that some type of investigation is necessary." *Essex*, 168 F. Supp. 2d at 554.

6

that "[i]n fact, during his suspension his income went up as he was able to concentrate on collection activities." ECF No. 35 at 9. He attests:

> During this time my occupation did not change and there was no change in my financial stability. I have provided information that has demonstrated that during the time of the suspension my income to my practice increased and my net worth increased.
>
> * * * * * * * *
>
> I considered my financial stability to be in place as a result of my net worth and the fact that I have had multiple checks of significant amounts waiting to be deposited, awaiting my review and my comparison of the accompanying documents with the original claims and the original services.

ECF No. 35-1 at 2, 4. These conclusory, self-serving assertions do not address or alter the falsity of Dr. Cohen's statements. Dr. Cohen represented that he had income from performing surgeries at a time when he was suspended from performing surgeries. This suspended income was the only income which Defendants undertook to insure.

Dr. Cohen also argues that the application questions are vague and ambiguous. ECF No. 35 at 7. "It is true that under Maryland law an insurance application, to justify an insurer's reliance on it, must be reasonably designed to elicit from [the applicant] the information which he possesses, material to the risk." *Essex,* 168 F. Supp. 2d at 556 (citation and quotation marks omitted); *see also Collier v. MD-Individual Practice Ass'n, Inc.*, 327 Md. 1, 6 (1992) and *Cheney v. Bell Nat'l Life Ins. Co.*, 315 Md. 761, 770 (1989) (insurers must design insurance applications with clear and unambiguous questions, and if they fail to do so, any ambiguity in the questions will be construed against the insurers).[3] Dr. Cohen does not explain how the word

---

[3] However, courts are slow to construe language in insurance policies strongly against the insurer:

> In Maryland insurance policies ordinarily are construed in the same manner as contracts generally. We do not follow the rule, adopted in some states, that insurance policies are to be construed most strongly against the insurer. . . . Words are accorded their ordinary and accepted meanings. The test is what meaning a reasonably prudent layperson would attach to the term. Thus, the language used may be ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson. If the language is ambiguous, extrinsic evidence may be consulted. . . . If, after considering extrinsic evidence, the ambiguity remains, it will ordinarily be resolved against the party who drafted the contract.

7

"occupation," followed by a blank space, nor how the question "Are you aware of any fact that could change your occupation," which the applicant himself has defined, are ambiguous. Language which is general in nature is not ambiguous. *See Cheney*, 315 Md. at 770; *see also Fitzgerald v. Franklin Life Ins. Co.*, 465 F. Supp. 527, 535 (D. Md. 1979) (In determining whether a misrepresentation occurred, "the Court may consider whether the question directed to the insured was reasonably designed to elicit information material to the risk.").[4]

Having concluded that Dr. Cohen made patently false statements on his insurance applications, the court must now decide whether these misrepresentations were material to the risk assumed by the Plaintiffs. A misrepresentation is material if it "would reasonably influence the insurer's decision as to whether it should insure the applicant." *Fitzgerald*, 465 F. Supp. at 535. The question of materiality is normally one of fact for the jury to decide. *Id.* "However, the materiality of the misrepresentation to the risk may be so obvious that the Court must rule as a matter of law that the misrepresentation is material." *Id.* at 535-36 (citations omitted). "In other words, if it is manifest from uncontradicted testimony or from the nature of the misrepresentations that the insured's false representations have been material to the risk, the Court must so find as a matter of law." *Id.* at 536.

In the context of disability insurance, a misrepresentation is material if it affects the risk of loss of earned income. *See Schreiber v. Mathews*, 441 F. Supp. 28, 31 (D. Md. 1977) (stating, in the context of disability insurance provisions under the Social Security Act, "[t]he general purpose of . . . disability insurance provisions . . . is to protect workers and their dependents from

---

*Collier*, 327 Md. at 5-6 (citations and quotation marks omitted). Thus, language will be construed against the drafting party only after it is deemed ambiguous and after extrinsic evidence is considered in interpreting the ambiguity.

[4] Dr. Cohen also asserts that Plaintiffs had a greater duty to ask clear and precise questions regarding his status as a licensed physician because they approached him with a solicitation. ECF No. 35 at 10. Putting aside his failure to support this assertion with legal authority, and his failure to show that a solicitation actually came from Plaintiffs, the questions were, in any event, clear and precise.

the risk of loss of income due to the insured's . . . disability," and accordingly, "entitlement to benefits is based upon the receipt of income from labor, which . . . disability would interrupt; and not upon the receipt of income from the investment of capital, which these events would presumably not affect."); Charles E. Soule, *Disability Income Insurance: The Unique Risk* 139, 169 (5th ed. 2001) ("The only type of income that can be considered as properly insurable is earned income, which is, simply, that income that is generated from an individual's own efforts in his or her profession, business, or trade"; it is "only that income that will cease when disability commences."). An insurer may avoid a policy based on a material misrepresentation which "results in the assumption by the insurer of a risk different from that which the applicant led it to suppose it was assuming." *John Hancock Mut. Life Ins. Co. v. Adams*, 205 Md. 213, 221 (1954).

Thomas Petersen, a PIU underwriter who participated in the underwriting of Dr. Cohen's disability policies, attests that PIU "relied upon the representations made by Dr. Cohen in his applications in considering whether to recommend the issuance of the Disability Policies, the amount of premium to charge, and whether any special terms and conditions should be included on the Disability Policies." Petersen Aff. at ¶ 5. According to Petersen, "[h]ad [PIU] been aware at the time we reviewed each of the Applications that Dr. Cohen had been disciplined and suspended, was not allowed to engage in his normal occupation as a surgeon performing surgeries, and was subject to a five-year probationary period as a result of his behavior, we would not have submitted the applications to London for final approval and issuance of the Policies." *Id.* at ¶ 13.[5] Finally, Petersen stated:

> Critical to our thinking that the failure to disclose the information set forth above was a material misrepresentation is the fact that, with disability insurance,

---

[5] Dr. Cohen complains that Petersen had no direct contact with the insurers, but agrees that "Petersen is an agent with authority to bind coverage to the Underwriters or insurers." ECF No. 35-1 at 5. Plaintiffs are members of Syndicate 4020, the group that accepted the risk of Dr. Cohen's insurance coverage, and contracted with PIU, *see* ECF No. 37-3 (Ex. A to Boyd Declaration). Petersen, as an underwriter at PIU, had authority to enter into insurance contracts on Plaintiffs' behalf. Boyd Aff. at 1-2, ECF No. 37-2.

the risk that is being insured is the risk of loss of income due to injury or illness. When Dr. Cohen was suspended, his income from performing surgical procedures likewise was suspended, which was the only duty he disclosed on the Application. Thus, at the time he signed and submitted his final Application, and at the time we issued the Policies, we did not know that his ability to earn income from performing surgeries had ceased as a result of the suspension.

*Id.* at ¶ 14. In addition, the declaration section of each policy clarifies that the insured's health, occupation, and income are all material to the issuance and continuation of the policy. Petersen Aff., Ex. B at USW 0116, Ex. C at USW 01410, Ex. D at USW 0166. This evidence merely supplements the obvious: Dr. Cohen's applications induced Plaintiffs to issue policies insuring his income from the practice of surgery.

In a similar context, a physician's failure to disclose that he was under a disciplinary investigation in an application for malpractice insurance was "patently material" and of such probative force that knowledge of the information would have, in all reasonable probability, precluded issuance of the policy. *Miller v. Ins. Com'r*, 70 Md. App. 355, 368-69 (1987). Dr. Cohen's reliance on *Heidenreich v. Metro. Life Ins. Co.*, 213 Md. 286 (1957) is misplaced. There, a life insurance applicant who stated that he had never consulted a physician in the past five years or been treated for an ulcer, *had* in fact been diagnosed with an ulcer and *had* seen a doctor over 30 times in the previous five years. It was alleged that the insurance company would have refused to issue the policy if it had known these facts. *Id.* at 293. However, strong evidence from two physicians indicated that the decedent died of a coronary attack and may not have known of, or even still had, the ulcer. *Id.* at 290-91. Thus, it was not clear either that the decedent had an ulcer when he applied for the insurance, or that the ulcer would have had an effect on the life that was being insured. Here, in contrast, it is abundantly clear that

Dr. Cohen insured his income as a surgeon at a time when he was precluded from earning it.

Defendants present the expert opinion of David Paige, the managing director and general counsel at Sterling & Sterling, Inc., ECF No. 35, Expert Report of David Paige, Ex. 3 at 1, which, for the most part, merely mirrors the arguments presented in Defendants' memorandum. In addition, he contends that Plaintiffs inappropriately shifted the burden to Dr. Cohen to seek clarification about alleged ambiguous questions on the applications. *Id.* at 14. This contention fails because, as noted, the questions at issue are not ambiguous. Mr. Paige also faults Plaintiffs for not providing underwriting criteria or investigating Dr. Cohen's stated intent to open a D.C. office. However, an insurer has no affirmative duty to investigate or to provide objective underwriting criteria on an insurer. *Essex*, F. Supp. 2d at 554; *N. Am. Specialty Ins. Co. v. Savage*, 977 F. Supp. 725, 731 (D. Md. 1997). Mr. Paige's report does not change the obvious fact that Dr. Cohen made material misrepresentations on his insurance applications.[6]

Defendants also insist that Plaintiffs' witness, Mr. Petersen, is unqualified to opine on whether Dr. Cohen's misrepresentation was material to Plaintiffs' risk. However, Maryland law does not restrict the materiality inquiry to the insurance company official's opinion and supporting reasons. *Fitzgerald*, 465 F. Supp. at 540 (citation omitted). "The Court, itself, can take judicial notice of the fact that certain information is 'patently material' to the risk assumed." *Id.* Here, the court need not rely on Mr. Petersen's "expert" testimony that Dr. Cohen's misrepresentations were material.[7]

---

[6] In light of its failure to affect the outcome of this case, it is unnecessary to rule on the admissibility of this evidence. Accordingly, Plaintiffs' motion to exclude it is denied as moot.

[7] Instead, the court has accepted Mr. Petersen as a fact witness. Defendants have "no objection to Petersen as a fact witness," ECF No. 47 at 1, and thus the motion to exclude his expert testimony is moot.

Dr. Cohen finally argues that "[t]here is no logical nexus between a temporary suspension and the risk of being disabled" especially "since the 'elimination' clauses of all of the policies meant benefits could never be owed during the period of the suspension." ECF No. 35 at 9. While it may be true that the elimination period overlapped with Dr. Cohen's first period of suspension (although not his second D.C. suspension), the question here is not whether the suspension is related to the risk of becoming disabled; the question, rather, is whether the suspension is related to risk of losing the source of the income being insured. About that, there is no doubt.

**IV.     Conclusion.**

The false claims Dr. Cohen made regarding his occupation and income were material as a matter of law. Accordingly, by separate order, Plaintiffs' motion for summary judgment will be granted and Defendants' motion for summary judgment will be denied.


Date: March 6, 2014                              /S/                        
                                                JILLYN K. SCHULZE
                                                United States Magistrate Judge